NEBEL *v.* SULLIVAN.

1. CANCELLATION OF INSTRUMENTS—FRAUD—EVIDENCE—SUFFICIENCY.
   In a suit for an accounting for the profits on the sale of a
   tract of timber land, a decree in favor of one of the defend-
   ants on his cross-bill for affirmative relief on the ground
   that he had been induced to purchase the land by fraudulent
   misrepresentations, *held,* not justified by the record.

2. PARTNERSHIP—ACCOUNTING.
   In a suit for an accounting on the theory that plaintiff was
   a partner of defendant and entitled to one-half of the profits
   on the sale of a tract of timber land, where the evidence
   shows that defendant concealed from plaintiff the details
   of the sale, and used every artifice to deceive plaintiff, and
   that defendant transferred some of the partnership property
   to his daughters without consideration, *held,* that plaintiff
   is entitled to an accounting which should not be restricted
   by the apparent rights of the daughters.

Cross-appeals from Alger; Sample (George W.), J., presiding. Submitted October 10, 1928. (Docket No. 67, Calendar No. 33,777.) Decided March 28, 1929. Rehearing denied June 20, 1929.

Bill by Richard W. Nebel against Thomas G. Sullivan, Charles W. Harrah, and others for an accounting. Defendant Harrah filed a cross-bill for affirmative relief. From a decree on the cross-bill, plaintiff and defendants Sullivan appeal. Reversed, and decree entered for plaintiff.

*Richard W. Nebel, in pro. per.,* and *Glenn W. Jackson,* for plaintiff.

*McDonald & Kaltz (Warner & Sullivan,* of counsel), for defendants Sullivan.

*Welsh, Bebout & Lee,* for defendant Harrah.

NORTH, C. J.    In the bill of complaint filed in this cause the plaintiff, Richard W. Nebel, is seeking an accounting from the defendants Thomas G. Sullivan, Marcella A. Sullivan, and Elizabeth Sullivan Pelton. The defendant Charles W. Harrah filed a cross-bill wherein he charges fraudulent misrepresentations by the defendant Thomas G. Sullivan, in consequence of which the defendant Charles W. Harrah seeks to have the transaction set aside out of which the plaintiff, Nebel, claims the profits arose incident to which he seeks an accounting. The relief sought in the cross-bill was granted in the circuit court to the defendant Harrah. The plaintiff and the three defendants first above named have appealed.

Hereinafter, Thomas G. Sullivan, who is the principal defendant, will be referred to as the defendant; and unless otherwise indicated in using the term defendants, reference will be made to Thomas G. Sul-

livan, Marcella A. Sullivan, and Elizabeth Sullivan
Pelton. The facts involved in substance are as fol-
lows: At the inception of this transaction Thomas
G. Sullivan was about 66 years of age, and for many
years he had been engaged in the lumber business
in the northern peninsula of Michigan. Marcella
A. Sullivan and Elizabeth Sullivan Pelton are his
daughters and are women of mature years. On Octo-
ber 23, 1919, Thomas G. Sullivan entered into a
contract to purchase what are known as the "Vincent
lands" consisting of 2,413.35 acres at $10 per acre.
He made a down payment of $133.50, leaving a bal-
ance of $24,000, of which $8,000 was to be paid
January 10, 1920. Prior to the date last mentioned
the defendant approached the plaintiff relative to the
latter's becoming jointly interested with him in the
purchase of this property, it being expected that
they would be able to dispose of it in a comparatively
short time at a substantial profit. These two men
thereupon entered into a contract in writing which
provided that in consideration of the plaintiff's as-
sistance in financing the proposition and in disposing
of the land he should have a one-half interest in the
land contract. Mr. Nebel arranged with the vendor
of the Vincent lands that in consideration of the pay-
ment of interest on the purchase price to July 10,
1920, amounting to $720, an extension to the latter
date within which to pay the first installment of
$8,000 would be granted. Mr. Nebel advanced the
$720 necessary to obtain this concession. Thereafter
both the plaintiff and defendant made efforts to se-
cure a purchaser for this property. A sale was not
consummated within the six months' period for
which the extension was secured. However, the
plaintiff claims he had secured a bona fide offer for
this property of $16 per acre.

As the extension of time was about to expire which had been granted for the payment of the $8,000 (July 10, 1920), the defendant again approached the plaintiff and the necessity of further financing the proposition was discussed. These parties disagree as to just what transpired between them. The plaintiff asserts that he was willing to continue to finance the proposition by advancing one-half the funds necessary on condition the defendant would do the same. The defendant claims the plaintiff refused to advance any more money to be used in the enterprise, and agreed that a third party might be taken in who would be allowed to share equally with the plaintiff and defendant in any profit that might be realized from the transaction. The defendant arranged with the vendor Vincent that, upon paying $720 as the semi-annual interest upon the unpaid purchase price, another extension of six months within which to make the payment of $8,000 would be granted. The defendant secured the money with which to make this interest payment, and it is claimed that this sum was obtained by him from his son Ernest Sullivan, in accordance with his understanding with the plaintiff that a third party might be taken in. The plaintiff denies there was any arrangement whatever contemplating the participation of a third party.

Prior to the arrangement for the second extension of time above noted, Mr. Sullivan had gotten into contact with the defendant and cross-plaintiff, Charles W. Harrah, this having been brought about through an agent by the name of Wood, who was endeavoring to dispose of a steamship owned by Mr. Harrah and who had been informed by the defendant Sullivan that this boat, the "W. H. Wolf," might be accepted as part payment in exchange for

the lands which defendant had for sale. In the course of the negotiations it developed that Harrah would be interested in a larger acreage of timbered lands than that constituting the Vincent tract. Thereupon the defendant, without the knowledge of the plaintiff, secured an option on what is known as the "Consolidated Lumber Company land," consisting of 1,502.03 acres. The price of this property was $7.15 per acre, making the total consideration $10,731.45. After some considerable negotiation and on the 14th day of August, 1920, a contract was entered into between the defendant and the cross-plaintiff whereby the Vincent lands and the Consolidated Lumber Company lands were sold to Mr. Harrah for $42 per acre, total price being $164,444. In part payment of the consideration Mr. Sullivan accepted the steamship "W. H. Wolf" at a valuation of $100,000. He was paid $5,000 on the date of the transaction and $20,000 six days later, August 20, 1920. Before this suit was brought, the balance of the purchase price was paid excepting $19,444. By stipulation, four notes for this amount have been left in the possession of the First National Bank of Alger County to await the outcome of this litigation.

Concerning the steamer "W. H. Wolf," involved herein, it should be stated that this was an old wooden boat said to have been built in 1887 or 1888. It obviously was out of date as a commercial craft, was in a bad state of repair, and of doubtful value. Beyond question, the $100,000 at which Mr. Harrah turned the boat over to Sullivan was out of all proportion to its actual value. In a supplemental finding made by the trial judge its value was fixed at $30,000. There is no occasion for our reviewing this determination, but we may say in passing that we are convinced that the amount so fixed was suffi-

ciently liberal. Instead of having the title of this
boat transferred to himself, the defendant Sullivan
had it transferred to his daughter Marcella A. Sul-
livan. Shortly thereafter an arrangement was made
with a Mr. Edward H. Horne, who had managed the
boat for Mr. Harrah, that he should become a half
owner thereof and continue as its manager. At the
time title to the boat was transferred by Mr. Harrah
it was insured for $85,000. Later this amount was
increased to $100,000. In October, 1921, the boat
was destroyed by fire, and $85,000 insurance was
paid incident to this loss. By reason of repairs
made, costs of operation, etc., there were outstand-
ing charges in large amounts which had to be paid
from the insurance; $10,000 of the insurance is said
to have been paid to the captain of the boat; and
Mr. Horne, by reason of being a part owner, shared
in the insurance. The total amount received by
Marcella A. Sullivan incident to her ownership of
this boat is fixed at $24,650.

It is the claim of the cross-plaintiff that Thomas
G. Sullivan falsely and fraudulently represented to
him that there were 7,000 feet of lumber per acre on
this land, which was worth $6 per thousand, and
that it was on this basis that the valuation of $42
per acre was reached. It is asserted that this repre-
sentation was untrue both as to quantity and value;
that Mr. Harrah did not know the falsity thereof;
and that he believed and relied upon these repre-
sentations of Mr. Sullivan in purchasing the timber
on these lands. It is on this ground that the cross-
plaintiff seeks to have the transaction rescinded.
The defendant denies making the alleged false repre-
sentations. The testimony on this phase of the case
is voluminous; and contrary to the determination
of the trial court, we are of the opinion that Mr.

Harrah's contention that he relied upon the alleged misrepresentations and was deceived and defrauded thereby is not sustained by the record in the case. We will not attempt to review the testimony in detail, but deem it sufficient to call attention to certain phases thereof. Mr. Harrah resided in the city of Detroit and is a man of very large experience in real estate transactions. For a number of years he has been engaged in promoting subdivisions in and about the city of Detroit. He testified he had promoted about 60 such subdivisions. On one occasion he was interested in the purchase of a tract of timber in Mississippi. On another he was a party to a transaction of large proportions incident to the purchase of lands and timber in Cuba. He took the pains to make a trip from Detroit to the northern peninsula, where this timber was located, for the purpose of making a personal investigation. While his investigation was rather superficial, none the less he was on the ground and had the opportunity of making such an examination as he saw fit. A man of his experience must have been well aware of the necessity of examining property of this character for the purpose of ascertaining value. That he did so understand and that he did so act are evidenced by the fact that he engaged the services of a timber cruiser by the name of Sweeney and sent him from Detroit to northern Michigan for the purpose of cruising these lands. This was done by Sweeney and a detailed report of the result of his investigation made to Harrah before this transaction was closed. By that report Harrah was advised of the fact that instead of there being substantially 27,000,000 feet of lumber on these lands, as he claims was represented by Sullivan, Sweeney estimated the amount at 21,770,000 feet. An attempt is made in

the record to show that Sullivan induced Sweeney to make an over-estimate of this timber. We are not impressed with the showing made in this regard; and it is rather strange if Sullivan were fraudulently inducing Sweeney to make a false report that he would be content with one which disclosed that Sullivan's claim was excessive to the amount of 5,000,000 feet and upwards. Likewise the record discloses, notwithstanding his claim to the contrary, that Harrah did not rely upon the statement of Sullivan as to the value of this timber. Instead, both he and his agent Wood made repeated inquiries as to value from a Mr. Scott who had had extensive experience and was dealing in property of this same character in the northern peninsula. We feel constrained to disagree with the trial judge wherein he found: "That the representations made to Charles W. Harrah were the inducing cause for his entering into the contract of purchase." Instead, we are thoroughly convinced from this record that the inducing cause in consequence of which Mr. Harrah became the owner of this timber was that he possessed an ardent desire to unload at the price of $100,000 an antiquated wooden boat, which, under the same manager who had operated it for Harrah, seemed to be a liability rather than an asset. A careful consideration of this record brings the conviction that in this transaction neither Mr. Sullivan nor Mr. Harrah was depending on the other for guidance, but instead they were dealing with each other at arm's length, each knowing these properties were being put into this transaction at excessive valuations. They had never met prior to these negotiations. Each relied upon and acted upon his own judgment in making this trade, and not upon the trade talk of the other. The cross-bill of Mr. Harrah should have been dismissed and the relief sought therein denied.

We still have for consideration the plaintiff's
claim for an accounting on the theory that he was a
partner of Thomas G. Sullivan, or at least was in-
terested in a joint enterprise which had to do with
the sale of the Vincent lands, and that in consequence
thereof he is entitled to one-half of the profits real-
ized from that transaction.   There is no material
conflict in the testimony touching the circumstances
preceding the advancement of $720 by Mr. Nebel and
the execution of the agreement of January 10, 1920,
between himself and the defendant, whereby it was
agreed the latter "would give him (Nebel) a one-
half interest in and to said land contract" under
which Sullivan was purchasing the Vincent lands.
Seriously conflicting testimony was given by and
in behalf of the respective parties as to what hap-
pened or what was agreed upon between them just
prior to July 10, 1920, when interest was again due
and the extension of time within which the $8,000
was to be paid was about to expire.

As hereinbefore stated, the defendant claims he
talked with the plaintiff, who suggested they secure
a third party to advance $720 in payment of the
semi-annual interest and thereby secure a second
extension of time within which to pay the $8,000
on the Vincent contract; that plaintiff said he did
not have the necessary funds and would be willing
to divide the profits three ways if the proposed ar-
rangement could be made; and that the defendant
did thereupon secure from his son, Ernest Sullivan,
$720, paid the interest, and secured the extension.
The plaintiff says he told the defendant at the time:
"If he could not sell these lands, I could," referring
to his opportunity to sell for $16 per acre.   The de-
fendant thought he could close the deal with Harrah
within 30 days.   Plaintiff says he told the defendant

he would put up dollar for dollar with him to carry the deal along, but denies there was any talk about getting a third party to advance the money and share in the profits. The negotiations with Harrah were all carried on by Sullivan. The deal was closed August 14, 1920. Two days later the defendant wrote plaintiff: ''I feel I will close this trade this week.'' It was already closed, $5,000 had been paid, and the title to the steamer ''W. H. Wolf'' transferred. On August 23, 1920, these parties met at St. Ignace, and there the plaintiff learned the land had been sold, and on the train going to Munising, where they resided, the defendant told him: ''He had closed the deal at $32 per acre,'' according to plaintiff's testimony. As above indicated, the sale to Mr. Harrah was for $42 per acre. Plaintiff claims nothing was said about the steamer ''W. H. Wolf'' having been taken in part payment. He did not know of this until May 1, 1923, when the information came to him at the trial of a case in the Federal court in Marquette involving in some manner the operation of the steamer ''W. H. Wolf,'' in which the Sullivans were interested. The day after these parties came from St. Ignace to Munising (August 24, 1920), the defendant gave the plaintiff a check for $4,000. When produced at the trial this check had written upon it: ''In full to date settlement.'' The plaintiff denies that the check bore this notation at the time he accepted it, and asserts that when Mr. Sullivan gave it to him nothing was said about its being plaintiff's share, but, instead, that the details of the transaction were to be settled later; and that there was thereafter talk of this character between the parties on frequent occasions. But the defendant claims that the words above quoted were on the check when delivered to the plaintiff, and that the

plaintiff accepted it as his share of the profits, expressing himself as more than satisfied. The defendant's claim that this check constituted a settlement in full is based upon the testimony of himself and his son George, to the following effect: That after defendant had secured the second extension of time on the Vincent contract he and his son George went to the plaintiff's office, and there the defendant expressed to the plaintiff his dissatisfaction in consequence of the plaintiff's having refused to put any more money into the deal, and complained that the defendant had been spending his time and money incident thereto, and that the plaintiff thereupon stated he could sell the Vincent land for $16 an acre, and the plaintiff made the defendant an offer to accept in satisfaction of his interest in the deal whenever the defendant might sell the Vincent property one-third of the profit on the basis of a sale at $16 per acre; and that this offer of the plaintiff was accepted by the defendant. This testimony is contradicted by the plaintiff.

It would serve no good purpose to detail the other testimony in the record bearing upon the controversy between these parties which arises from the defendant's claim on the one hand that the plaintiff has been paid in full as above indicated, and the plaintiff's contention on the other hand that he is entitled under the written agreement of January 10, 1920, to one-half the profits derived from this transaction. We have considered the record carefully and find it difficult to give credence to the defendant's contention. Among incidents leading to this conclusion are the following: He carefully concealed from the plaintiff the actual consideration received from Harrah; he told him nothing at all definite about the steamer "W. H. Wolf;" he wrote plaintiff a letter

stating: "I feel I will close this trade this week," two days after it had already been closed; later he told the plaintiff (according to the latter's testimony) that the lands were sold for $32 per acre, when in fact the undisputed evidence shows they were sold for $42 per acre, and also that $10,000 had been received on the purchase price, when in fact $25,000 had been paid; and, notwithstanding the plaintiff often approached the defendant relative thereto, the latter never gave a statement embodying the details of the transaction. Of course, the defendant claims the payment of $4,000 constituted a settlement in full by reason of the alleged agreement entered into between the parties in July, 1920; but even under this agreement the plaintiff was entitled to a detailed statement of the transaction so that he might ascertain whether $4,000 was the amount he was entitled to receive, assuming that defendant's contention as to this subsequent agreement is correct. We are thoroughly in accord with the finding of the circuit judge wherein he stated: "The testimony shows that every artifice was indulged in by Thomas G. Sullivan to deceive Mr. Nebel."

The plaintiff is entitled to an accounting, which should not be restricted by any apparent rights of the defendants Marcella A. Sullivan or Elizabeth Sullivan Pelton, because in so far as either of them has become possessed of the proceeds of this transaction or has benefited or profited thereby, she has done so without consideration and without right as against the plaintiff. The record discloses that the defendant's bank account is carried in the names of his two daughters; that part of the money received from this transaction was used to pay off mortgages on property standing in the daughters' names; that

the four unpaid Harrah notes have been transferred to Marcella A. Sullivan, and title to the so-called Alger lands which were purchased with money received from Harrah is also in the name of Marcella A. Sullivan. The rights of these defendants in the particulars indicated are subordinate to the plaintiff's right to an accounting.

Both plaintiff and defendants Sullivan agree that the record now before us does not contain all the information essential to a detailed and accurate accounting. It is doubtful if an absolutely accurate accounting can ever be effected between these parties, because no record has been made of many details incident to the transaction involved. The bill of complaint was filed over five years ago, and it would be fortunate for all concerned if their rights could be determined without further delay. If substantial justice can be so accomplished, the final result should be determined upon this record. We construe the agreement of January 10, 1920, between the plaintiff and the defendant to give to the plaintiff the right to have one-half of the net profits derived from the sale of the timber on the Vincent lands. Under the circumstances of this case he is not entitled to share in that part of the profits which should be apportioned to the Consolidated Lumber Company's property. The defendant found it necessary to include the Consolidated property in order to consummate the transaction with Harrah. This was to plaintiff's advantage, as it resulted in a profitable sale of the Vincent property, which otherwise could not have been accomplished. Surely the plaintiff has no reason to complain, and he should not be allowed to profit by the sale of the timber on the Consolidated lands, in which he had absolutely no part, and which was accomplished without his knowl-

edge or the use of any of his funds. These two properties were put into the Harrah transaction at the same price per acre. The money received therefor should be apportioned according to acreage, substantially 61½ per cent. to the Vincent property, and 38½ per cent. to the Consolidated Lumber Company property. The net profit cannot be determined accurately, but so far as the Vincent property is concerned it may be substantially determined as follows: Cost, including interest paid, $27,468.58. Exclusive of Harrah's four unpaid notes aggregating $19,444, not including accrued interest, the defendant has received: (1) from the sale of the steamer "W. H. Wolf" approximately $24,650, and (2) cash from Harrah $45,000, making a total of $69,650; 62½ per cent. of this total, or $42,834.75, was received from Harrah for the Vincent property. Deducting from this its cost of $27,468.58, we have the net profit received to date on the Vincent lands as $15,366.17. One-half of this ($7,683.08) belongs to Mr. Nebel, but he has been paid $4,000, thus leaving his share of the paid-in profits on this parcel as $3,683.08. Defendant should account to the plaintiff for this amount with interest thereon at 5 per cent. per annum from August 14, 1920. Sixty-one and one-half per cent. of any amount hereafter collected on the four outstanding Harrah notes will be a further profit on the Vincent property, one-half of which will belong to the plaintiff. Unless counsel can agree upon some other plan, the collection of these notes or other disposition of them must be worked out through a receiver under the appointment and control of the circuit court. For the purpose of satisfying the terms of the decree the plaintiff will have a lien upon all sums collected on the outstanding Harrah notes which otherwise would

be due to the defendant; and he may also have a lien upon the interest of the defendants Sullivan in the so-called Alger lands which were purchased with money received from Mr. Harrah; and, if necessary, the plaintiff may be subrogated to the former rights of the mortgagees in the Munising property belonging to the Sullivans to the extent the mortgages were satisfied by funds received from Mr. Harrah incident to this transaction, the amount so used having been fixed in the decree entered in the circuit as $13,264.67.

A decree may be taken granting the relief hereinbefore indicated to the plaintiff and dismissing the cross-bill of the defendant Harrah. However, if upon settling the decree, it is made to appear that the method of accounting hereinbefore suggested does not work out substantially a correct result, provision will be made for remanding the case for an accounting. The appellants will have costs against the defendant Harrah, and the costs of the plaintiff may also be taxed against the defendants Sullivan.

FELLOWS, WIEST, CLARK, McDONALD, POTTER, and SHARPE, JJ., concurred. FEAD, J., did not sit.